Patrick M. Flatley
United States Bankruptcy Judge

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| DONNA M. BLACK, | ) | Case No. 16-bk-532 |
| | ) | |
| Debtors. | ) | Chapter 7 |
| _____ | ) | |
| | ) | |
| WORLD'S FOREMOST BANK – | ) | |
| CABELA'S CLUB VISA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adversary No. 16-ap-43 |
| | ) | |
| DONNA M. BLACK, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## MEMORANDUM OPINION

World's Foremost Bank – Cabela's Club Visa (the "Bank"), seeks a determination that the $7,828.35 owed to it by Donna M. Black (the "Debtor") is nondischargeable under § 523(a)(2)(A) of the Bankruptcy Code. In support of its complaint in that regard, the Bank asserts that a presumption of nondischargeability exists under § 523(a)(2)(C) with regard to $5,917.49 of its total claim. The Debtor opposes the relief sought by the Bank and asserts that she incurred the debt to the Bank with the intent to repay it, but that circumstances beyond her control caused her financial situation to spiral downward such that she filed for Chapter 7 relief after seeking legal counsel.

For the reasons stated herein, the court will deny judgment to the Bank and dismiss the complaint.

1

## I.  BACKGROUND

On November 17, 2015, the Debtor obtained credit from the Bank in the form of a credit card with a credit limit of $8,000.  From that time until February 8, 2016, the Debtor incurred and paid for debt totaling $185.25.  As of February 25, 2016, the Debtor did not have an account balance.  From February 26, 2016, to March 23, 2016, the Debtor used her credit from the Bank to make purchases, and acquire a cash advance, totaling $7,993.84, which was the Debtor's statement balance as of March 27, 2016.  On May 24, 2016, the Debtor filed her voluntary petition for relief under Chapter 7 of the Bankruptcy Code.

The Bank filed its complaint alleging nondischargeability on September 9, 2016.  Trial upon it was conducted on March 23, 2017.  Following the trial, the court took the matter under advisement.

## II.  ANALYSIS

Section 523(a)(2) excepts from discharge any debt for, among other things, "an extension, renewal, or refinancing of credit, to the extent obtained by— (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's . . . financial condition."  In the Fourth Circuit, a creditor asserting a claim under § 523(a)(2)(A) must prove five elements by a preponderance of the evidence—namely, "(1) false representation, (2) knowledge that the representation was false, (3) intent to deceive, (4) justifiable reliance on the representation, and (5) proximate cause of damages."  *Nunnery v. Roundtree (In re Roundtree)*, 478 F.3d 215, 218 (4th Cir. 2007).  However, the Supreme Court recently expanded the application of § 523(a)(2)(A) by concluding that the inclusion of "actual fraud" within the provision indicates a clear Congressional intent to except from discharge debts incurred through fraudulent actions distinct from false representations.  *Husky Int'l Elecs., Inc. v. Ritz*, 136 S. Ct. 1581, 1586 (May 16, 2016).  Thus, the five step analysis set forth in *Nunnery* still applies when making determinations regarding dischargeability if property was allegedly obtained by false representation or false pretenses, but does not apply with regard to alleged actual fraud.

In finding that "actual fraud" can exist without a misrepresentation, the Supreme Court expanded the scope of § 523(a)(2)(A) in cases where "actual fraud" is alleged.  The terms included within § 523(a)(2)(A), including "actual fraud," are interpreted as defined at common law.  *Field v. Mans*, 516 U.S. 59, 69 (1995).  "Actual fraud" is comprised of two parts: "actual" and "fraud."  *Husky*, at 1586.  At common law, "actual" "denotes any fraud that "involve[s]

2

moral turpitude or intentional wrong." *Id.* (citing *Neal v. Clark*, 95 U.S. 704, 709 (1878)). Thus, actual fraud is any fraud carried out with wrongful intent. *Id.* "Fraud" proved far more challenging to define, and while the Court noted that it generally involves "deception or trickery," it elected to refrain from "adopt[ing] a definition for all times and circumstances." *Id.* at 1586-87.

Notably, the party asserting nondischargeability bears the burden by a preponderance of the evidence that the debt is nondischargeable under § 523(a)(2)(A), *Grogan v. Garner*, 498 U.S. 279, 291 (1991), because the court narrowly construes exceptions to discharge in favor of providing debtors with a fresh start. *See Foley & Lardner v. Biondo (In re Biondo)*, 180 F.3d 126, 130 (4th Cir. 1999).

Here, the circumstances giving rise to the Bank's complaint present additional issues unique to actions based upon a debtor's use of a credit card. First, the court must consider "whether the debtor made *any* representation to the creditor." *Chase Bank USA, N.A., v. Ritter (In re Ritter)*, 404 B.R. 811, 824 (Bankr.E.D. Pa. 2009) (emphasis in original). Courts generally hold that a debtor's use of a credit card constitutes an implied representation by the debtor of either her intent to repay the charges incurred or her intent and ability to repay the charges incurred. *See id.* (identifying the split of authority). This court finds the former to be the better-reasoned analysis. "To hold that the use of the card is a representation of the debtor's ability to pay . . . 'would be contrary to the reason consumers use credit cards, *i.e.*, because they lack the ability to pay in full.'" *Id.* at 824-25 (quoting *In re Feld*, 203 B.R. 360, 367-68 (Bankr.E.D. Pa. 1996)). In any event, the debtor's intent is a central inquiry, and the court must determine whether the Debtor intended to deceive the Bank when she obtained and used the credit at issue here.

Second, a presumption of nondischaregeability under § 523(a)(2)(A) exists for "(I) consumer debts owed to a single creditor and aggregating more than $675 for luxury goods or services incurred by an individual debtor on or within 90 days [prepetition] . . . ; and (II) cash advances aggregating more than $950 that are extensions of consumer credit under an open end credit plan obtained by an individual debtor on or within 70 days [prepetition] . . . ." 11 U.S.C. § 523(a)(2)(C)(i). The court must therefore determine whether and to what extent a presumption arises here with regard to the debt incurred by the Debtor from February 26, 2016, to March 23, 2016.

3

Having considered the evidence adduced at the trial of this action, the parties' respective arguments in that regard, and the totality of the circumstances surrounding the Debtor's incurrence of the debt due and owing to the Bank, the court finds that the Bank failed to meet its burden under § 523(a)(2)(A). First, the court believes that a presumption under § 523(a)(2)(C) either does not arise here, or was adequately rebutted by the Debtor, as to any of the purchases made by the Debtor in the 90 days prepetition. In that regard, the court finds that the Bank's evidence to support its assertion of a presumption under § 523(a)(2)(C) was inadequate to establish the luxury status of the bulk of the purchases made by the Debtor. For instance, the Bank provided a list of the purchases made by the Debtor within 90 days prepetition that it believes constitute luxury goods, and a representative of the Bank testified generally as to how the Bank determined which purchases constituted luxury goods or services. Notably, however, the court is without sufficient information for most of the purchases to determine whether they constitute purchases for luxury goods or services.

But for the Debtor's $420.80 purchase for boots at Cherokee Trading on March 5, 2016, and her purchases for a computer game that she and her son play, the court does not know specifically what purchases the Debtor made. The point of sale, date, and amount of the purchases is not enough information for the court to determine whether the purchases were for luxury goods or services; that information sheds no light on the items or services actually purchased. For example, it could be that the Debtor's March 5, 2016 purchase of $183.61 at Kohl's, commonly known to the court as a home goods and clothing store, could be for housewares necessary for the Debtor to reconstitute her household after the March 3 fire that destroyed her home, or the purchase could be for a watch, perfume, or other non-essential product. The failure of the Bank in meeting its evidentiary burden in that regard, leaves the court with mere speculation.

As for the boots and the computer game purchases, the court finds that the Debtor adequately rebutted the presumption of nondischargeability. In that regard, she testified that the boots were a gift for a visiting friend whose possessions were lost in the fire at the Debtor's home. Despite the boots being a luxury good under § 523(a)(2)(C), the court finds the circumstances surrounding the Debtor's purchase of them adequately rebuts the presumption that the $420.80 should be nondischargeable. Similarly, the court finds that the Debtor adequately rebutted the presumption that her purchases related to the computer game that her and her son

4

play. Specifically, the Debtor testified that the game is essentially their leisure and was particularly critical for them during the period after they lost their home to fire. Although there were purchases made by the Debtor in that regard before the fire occurred, the court finds them to be reasonable amounts spent for leisure. Likewise, the court does not find anything inherently problematic or abusive about simple leisure items being obtained on credit. It is not unusual for consumers to make such purchases using credit. Finally, regarding the cash advance at issue in this proceeding, the Debtor obtained it more than 70 days prepetition such that it is not presumptively nondischargeable. And despite, the Bank's argument to the contrary, cash advances are not luxury goods or services under § 523(a)(2)(C)(i)(I), as evidenced by their inclusion only in § 523(a)(2)(C)(i)(II).

Having determined that the presumption under § 523(a)(2)(C)(i) either did not arise here or was adequately rebutted by the Debtor, the court must still turn to the merits of the Bank's complaint under § 523(a)(2)(A). In that regard, the court finds that the Bank failed to meet its burden showing that the Debtor obtained credit from it through false pretenses, a false representation, or actual fraud. Specifically, the court believes that the evidence adduced at trial shows that, based upon the totality of the circumstances, the Debtor did not intend to deceive the Bank when she obtained the credit from the Bank or used that credit.[1] Rather, the court finds that the Debtor, despite apparently misstating her annual income in applying for credit from the Bank,[2] intended to repay the Bank in the regular course and thus did not engage in the type of deception or trickery that § 523(a)(2)(A) targets. In fact, the court finds that the Debtor used the card in a typical fashion; incurring some charges and paying her balance when due. But for the Debtor's cash advance of $3,200, which was allegedly lost during the fire at her home, and the

---

[1] *See Ritter*, 404 B.R. at 826 (enumerating factors considered to determine a debtor's intent). Notably, however, the unique circumstances surrounding the Debtor's use of the subject credit, *i.e.*, the fire that destroyed her home, lessens the importance of the factors generally considered by the court in a proceeding like this one.

[2] Notably, the Debtor's application first became an issue at trial. It is absent from the Bank's complaint, which does not include an allegation under § 523(a)(2)(B). That provision revolves around written misstatements respecting a debtor's financial condition. When questioned by the court regarding the use of the Debtor's application, the Bank did not attempt to amend its complaint but instead noted that it introduced the Debtor's application simply as part of the totality of the circumstances for the court to consider in adjudicating its complaint under § 523(a)(2)(A).

5

Debtor's need to reconstitute her household after the fire, the court believes that the Debtor's use of the card was not atypical.  Nothing about the Debtor's acquisition or usage of the credit, in the court's view, shows a deceptive intent by the Debtor.  Having said that, the court is somewhat concerned about the Debtor's apparent misstatement of her annual income when she applied for the credit, but the court cannot find that that, standing alone in the face of the totality of the circumstances, shows that the Debtor intended to fraudulently use the credit card.  Moreover, the Debtor testified multiple times during the trial that she intended to repay the Bank.  Only after coming to terms with the mounting financial pressure she faced after she lost her home and obtaining the advice of counsel, whom she spoke to after incurring the charges, did she decide to seek relief under Chapter 7 rather than try to claw out from under the mountain of debt facing her.

### III. CONCLUSION

Based on the foregoing, the court finds that the Debtor did not have an intent to deceive the Bank, or otherwise engage in deception or trickery, when she obtained and used credit from the Bank.  The court will therefore enter a separate order dismissing this proceeding.